**MOUNTAIN FIR LUMBER CO., INC.,**
**an Oregon Corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 520–85C.

United States Claims Court.

June 9, 1987.

George J. Cooper, III, Portland, Or., for plaintiff. Robert R. Carney, of counsel.

Genevieve Holm, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Thomas W. Petersen, Washington, D.C., for defendant. Vincent L. De-Witte, U.S. Dept. of Agriculture, of counsel.

## OPINION

BRUGGINK, Judge.

Plaintiff seeks to recover alleged overcharges paid pursuant to certain contracts for the sale of timber. Presently before the court are the parties' cross-motions for summary judgment. After consideration of the pleadings and oral argument, the court concludes that there are no issues of material fact and that plaintiff is entitled to judgment as a matter of law.

### FACTUAL BACKGROUND

Mountain Fir Lumber Co. ("Mountain Fir") is engaged in the business of manufacturing wood products from timber purchased from various sources, including the United States Forest Service. This action involves the following contracts for the purchase by Mountain Fir of timber on tracts located within the Mt. Hood National Forest:

| Sale | Contract No. | Date[*] |
|------|-------------|---------|
| Cedar Creek | 03476–3 | 11/20/74 |
| Baseball | 03621–4 | 08/27/75 |
| Reline | 03873–1 | 01/12/77 |

Each of the contracts was prepared on the Forest Service's standard contract form 2400–6 (9/73). Although the contracts are particularized with respect to location, tree species, volume estimates, and rates per unit of measure, the contractual provisions at issue for all three contracts are identical in relevant respects.

The contracts require plaintiff to pay for all timber removed in either of two ways. Material meeting certain minimum requirements is paid for at a contractually specified rate per thousand board feet (MBF). This is referred to by the parties variously as "MBF material," "merchantable timber," or "net scale" material. Remaining substandard or nonmerchantable material is paid for at a flat rate by the acre. This

is referred to as per acre or "PAM" material.

The process of making the gross and net volume determinations required by the contract to identify merchantable timber is known as scaling.[1] After logs are cut, they are scaled, usually by an independent logging service, before being taken to the mill. Timber removed by Mountain Fir was scaled by the Columbia River Scaling and Grading Bureau ("Columbia River"), an independent scaler service approved by the Forest Service. Scaling was performed in accordance with the National Forest Scaling Handbook.

The present dispute primarily involves the meaning of two contract provisions, Sections A2 and A5. Both consist of standard printed matter with significant type-written additions. Section A2 is entitled "VOLUME ESTIMATE AND UTILIZATION STANDARDS." The present version of Section A2 was developed and incorporated into the standard timber sales contract in 1973. The prior version of the section, used by the Forest Service in contract form 2400–5 (9/70), was the subject of a dispute between the parties which was resolved in *Mountain Fir Lumber Company v. United States*, 222 Ct.Cl. 619 (1980). That prior version of Section A2, however, differed from the present version in certain respects which will be discussed subsequently.

The form of Section A2 used in both the Baseball and Cedar Creek contracts is set out below. Only the specific quantity of board feet and acres are omitted.[2]

A2 – Volume Estimate and Utilization Standards, applicable to B2.1, B2.2, B2.4 and B6.4

| SPECIES AND PRODUCT *Pieces of at least 50 Bd. Ft. Net Scale Subject to Per M Pricing: | ESTIMATED QUANTITY AND UNIT OF MEASURE M Board Feet | MINIMUM TREE SPECIFICATIONS INCLUDE ONE MINIMUM PIECE DIAMETER BREAST HIGH (d.b.h.) Inches | MINIMUM PIECE SPECIFICATIONS | | |
|---|---|---|---|---|---|
| | | | LENGTH Feet | DIAMETER INSIDE BARK AT SMALL END Inches | NET SCALE IN % OF GROSS SCALE |
| Ponderosa pine and western white pine except older dead ponderosa pine | | 9.0 | 8 | 6 | 33 1/3 |
| Douglas-fir and western larch | | 9.0 | 8 | 6 | 33 1/3 |
| White fir and other speices | | 9.0 | 8 | 6 | 33 1/3 |
| *Pieces of at least 20 and less than 50 Bd. Ft. Net Scale Subject to Per Acre Pricing: | Acres | | | | |
| All species and older dead ponderosa pine containing at least 20 Bd. Ft. Net Scale | | 9.0 | 8 | 6 | 33 1/3 |
| *A piece is one or more A13 products (one or more scaling segments) | | | | | |
| TOTAL | | | | | |

The column headings, such as "SPECIES AND PRODUCT," "ESTIMATED QUANTITY AND UNIT OF MEASURE," etc., are printed material. Everything below the column and subcolumn headings is typed. Beneath the column "SPECIES AND PRODUCT" are two typed categories: " * Pieces of at least 50 Bd. Ft. Net Scale Subject to Per M Pricing" and " * Pieces of at least 20 and less than 50 Bd.

1. Scaling is defined in the contracts in very general terms: "Scaling, as used herein, involves ... various volume determination methods." Section B6.8. Plaintiff defines the process variously as: "the method by which the number of board feet and a percentage of un-sound timber in logs is determined," Plaintiff's Memorandum In Support of Plaintiff's Motion For Summary Judgment ("Memorandum") at 8; and "the determination of the gross and net volume of logs by the customary units for the product involved," Memorandum at 3. Defendant offers its own substantially similar definition: "the process of estimating the gross or merchantable volume in a log." Government's Opposition to Plaintiff's Motion For Summary Judgment at 4.

2. The Reline contract has slight differences in the description of "Species and Product."

Ft. Net Scale Subject to Per Acre Pricing." Both categories are described in terms of species of wood such as Ponderosa Pine or Douglas Fir. The term "Pieces" in both categories is marked with a footnote. The note at the bottom of the chart defines the term: " * A piece is one or more A13 products (one or more scaling segments)." Except where the term is marked with an asterisk, the term piece is not otherwise defined in the contract. An "A13 product," in turn, is specified in Section A13, "Scaling Instructions and Specifications," as a segment of a log of between 8 and 20 feet. A maximum scaling length is thus 20 feet. The parties agree that under applicable scaling specifications, a log exceeding 20 feet in length would be broken down, in an imaginary sense only, into two or more scaling segments of less than 20 feet. As a rule, a log would have more than one individual scaling segment. Consequently, the term piece as defined in this manner in effect means the whole log, regardless of the number of scaling segments.

Column one, "SPECIES AND PRODUCT" does triple duty in the version of Section A2 presently in dispute, and therein lies the reason for most of the parties' disagreement on the section's overall meaning. In both the earlier and present versions of Section A2, this column creates two classes of product—viz., that subject to MBF pricing, and that subject to PAM pricing—and also identifies the particular species of trees being sold. The criteria which was added to the "SPECIES AND PRODUCT" column by the 1973 change was that each piece had to have at least 50 board feet "net scale" of merchantable timber to be subject to MBF pricing. Any piece not meeting that standard would be treated as PAM material.

3. Because of the potential for confusion, it is important to distinguish between "minimum net scale" as it appears in column one, and the requirement of "Net Scale in % of Gross Scale," which is set out as a subheading under column four. While both are devices to measure merchantable timber, minimum net scale refers to the cubic volume of useable wood in a " *

The second column of Section A2 is entitled "ESTIMATED QUANTITY AND UNIT OF MEASURE." It lists the anticipated volume of timber by species and acre. The third column is captioned, "MINIMUM TREE SPECIFICATIONS—INCLUDE ONE MINIMUM PIECE: DIAMETER BREAST HIGH." Underneath, the minimum diameter is given in inches. The fourth column, "MINIMUM PIECE SPECIFICATIONS," presently has three sub-columns: "Length," "Diameter Inside Bark at Small End," and "Net Scale in % of Gross Scale." These minimum specifications are termed by the parties in their briefs as "minimum utilization standards." The percentage given under "Net Scale in % of Gross Scale" [3] is 33⅓. This refers to the minimum amount of merchantable or net scale material as a percentage of the total gross scale for the piece. If a piece is at least 33⅓% merchantable or net scale, then it meets the net/gross scale test. It is this latter requirement which is the specific focus of the plaintiff's claim. Plaintiff argues that defendant incorrectly ordered Columbia River to apply the one-third net scale/gross scale requirement to individual scaling segments rather than to a whole log, which might consist of several scaling segments. As a result, it claims it overpaid defendant $7,887.57. Plaintiff alleges that it is in effect being charged twice for the same wood, since it paid for the wood represented by the $7,887.58 when it made a PAM payment for the relevant acreage.

Once timber is classified under Section A2 as to merchantability, Section A5 sets out applicable payment rates. Subsection A5a gives the rates for MBF or merchantable material. Subsection A5b creates flat rates for PAM or nonmerchantable material. The entire section appears in the Baseball and Cedar Creek contracts, less prices, as set forth below:

piece," while the one-third net scale/gross scale test expresses the minimum percentage of useable wood as a part of the gross "piece." Under the first requirement, only if a " * piece," or whole log, contains at least 50 board feet of useable wood is it subject to MBF pricing, whereas a "piece," without the footnote must be at least 33⅓% merchantable wood.

**A5 — Timber Payment Rates, applicable to B3.1 and B4.0**

**A5a — For Species and Products to be Paid for at Rates Escalated under B3.2**

| SPECIES AND PRODUCT | UNIT OF MEASURE | RATES PER UNIT OF MEASURE | | | | | BASE INDEX |
| | | BASE $ | ADVERTISED $ | BID PREMIUM $ | BID (Tentative) $ | REQUIRED DEPOSITS SLASH DISPOSAL $ | |
| *Pieces of at least 20 Bd. Ft. Net Scale Subject to Per M Pricing: | | | | | | | |
| Douglas-fir and Other Species | M Bd.Ft. | | | | | | |
| *A piece is one or more A13 products (one or more scaling segments) | | | | | | | |

**A5b — For Species and Products to be Paid for at Flat Rates**

| SPECIES AND PRODUCT | UNIT OF MEASURE | RATES PER UNIT OF MEASURE | | | | REQUIRED DEPOSITS SLASH DISPOSAL $ |
| | | BASE $ | ADVERTISED $ | BID PREMIUM $ | BID (Flat) $ | |
| *Pieces of at least 20 Bd. Ft. Net Scale Subject to Per Acre Pricing: | | | | | | |
| All Species Utility (pulp) and Special Cull | Acres | | | | | |
| *A piece is one or more A13 products (one or more scaling segments) | | | | | | |

---

## The Prior Litigation

Since the 1973 changes to the standard form contract had their origins in the parties' earlier dispute, the prior version of Section A2 needs to be considered. A sample is set forth below:

A2 — Volume Estimate and Utilization Standards, applicable to B2.1, B2.2, B2.4 and B5.413.

| SPECIES, PRODUCT, AND UTILIZATION SCALE LENGTH | ESTIMATED QUANTITY, AND UNIT OF MEASURE | MINIMUM TREE SPECIFICATIONS | | MINIMUM PRODUCT SPECIFICATIONS FROM TREES MEETING MINIMUM TREE SPECIFICATIONS | | | |
|---|---|---|---|---|---|---|---|
| | | DIAMETER BREAST HIGH (d.b.h.) Inches | PRODUCT UNITS Number | LENGTH Feet | DIAMETER INSIDE BARK AT SMALL END Inches | NET SCALE IN % OF GROSS SCALE | MINIMUM NET SCALE Board feet |
| Douglas-fir, western larch, western white pine logs 8' | | 10 | 1 | 8 | 6 | 33 1/3 | 50 |
| Western hemlock and other coniferous species of logs 8' | | 10 | 1 | 8 | 6 | 33 1/3 | 50 |
| All species logs subject to per acre pricing | | 10 | 1 | 8 | 6 | -- | 10 |
| TOTAL | | | | | | | |

Section A2 of contract form 2400–5 differed from the version in dispute in two significant respects. First, the term "piece" did not appear. Instead, the term "product" was used in the final column labeled, "MINIMUM PRODUCT SPECIFICATIONS FROM TREES MEETING MINIMUM TREE SPECIFICATIONS." Second, this minimum specification column contained a subheading labeled, "Minimum Net Scale," which set out the minimum amount of useable wood required in terms of board feet. The version of Section A2 presently in controversy has no such separate sub-column. Instead, the minimum net scale requirement was incorporated, as discussed above, into the first column under "SPECIES AND PRODUCT."

With respect to this previous version of the contract, in the early 1970's Mountain Fir claimed that the minimum product specifications of Section A2, specifically the minimum net scale requirement, applied to an individual scaling segment and not to a whole log. Initially the Forest Service took the position that the minimum net scale provision would apply to a log as a whole, regardless of how many scaling segments it might contain. The Forest Service eventually conceded, however, that a literal reading of the contract supported the position that the minimum net scale requirement should be applied to individual scaling

segments, although it maintained that this result was contrary to the Service's original intent. Plaintiff's interpretation was eventually upheld by the trial court in *Mountain Fir:*

When the terms of plaintiff's contracts are given their clearly intended meaning, there emerges a plain and unambiguous declaration that scaling of logs was to be in 20 foot (maximum) segments, and that scaling required in making the "minimum net scale" determination required by Section A2 was, as the Forest Service's final decision properly held, to be performed in precisely the same manner as that required in determining scaled volume.

*Mountain Fir,* No. 361–78, slip op. at 19, (Trial Division, Ct.Cl. Oct. 22, 1979), *aff'd,* 222 Ct.Cl. 619 (1980). Before this determination, however, and in the midst of the previous dispute, Section A2 was modified in the two previously-mentioned respects.

After revision of Section A2 in 1973, and until May of 1982, Columbia River applied all minimum specifications, including the one-third net scale/gross scale test, to the log, rather than to the individual scaling segment. By May of 1982, Mountain Fir had cleared the contract parcels and all payments requested by the Forest Service had been made. Nonetheless, the contracts were not formally closed pending a recom-

putation by the Forest Service of any amounts due pursuant to revision of the log scaling computer program.

By letter dated May 28, 1982, defendant advised Mountain Fir that "recent Forest Service audits of the Columbia River Bureau's computer program for Eastside volume determination has [sic] revealed some program errors." One such error noted was that "[o]n logs with more than one segment, the ⅓ net/gross volume was being made on the whole log, not the segment." Because the Forest Service viewed this as an erroneous method, it sent Mountain Fir a statement of account for each of the timber sale contracts, reflecting adjustments made as to volume removed. Plaintiff paid under protest the adjustments requested in an aggregate amount of $7,887.56 for the three contracts.

On May 16, 1985, Mountain Fir submitted to the Contracting Officer ("CO"), Mt. Hood National Forest, its claim pursuant to the Contracts Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1982). On July 29, 1985, the CO denied plaintiff's claim. The complaint was filed in this court on September 10, 1985. Both parties have moved for summary judgment.

### DISCUSSION

The question before the court is whether the one-third net scale/gross scale test should be applied to the whole log or to each scaling segment. Plaintiff concedes that if it were not for the addition of the footnote definitions in Section A2, it would have no real argument. The opinion in *Mountain Fir* creates a strong presumption that other specifications than just net scale would have been found applicable to individual scaling segments. Plaintiff asserts, however, that addition of the footnotes dictates a different result. It argues that the term "piece" must mean the same thing throughout the contract. Since it is defined in the first column of Section A2 and in Section A5 as meaning in effect the whole log, and since the term is otherwise undefined, that meaning is controlling for all subsequent occurrences of that term, including the one-third net scale/gross scale test. Defendant argues that the term is used in a different sense at the two

footnoted places than it is used elsewhere in the contract.

The words "piece" or "pieces" appear four times in Section A2, twice with a footnote definition and twice without. The term "pieces" appears twice in Section A5, both times defined as "one or more scaling segments." Finally the term appears as "piece" or "pieces" five times in Section B2.2, none of which are defined. All of the typewritten uses refer to the definition. None of the printed uses are defined.

 Determination of whether the term "piece" varies in meaning according to its context is guided by the interpretive principle that "a word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing, in the absence of countervailing reasons." 4 S. Williston, A Treatise on the Law of Contracts, § 618 (3d ed. 1961); *see also, McLane & McLane v. Prudential Insurance Co.*, 735 F.2d 1194 (9th Cir. 1984). Another bit of common sense which has found its way into the law is that later, typewritten contract terms will take precedence over standard printed matter. *Delhomme Industries, Inc. v. Houston Beechcraft*, 669 F.2d 1049, 1059 n. 25 (5th Cir. 1982); *Ocean Barge Transport v. Hess Oil Virgin Islands*, 598 F.Supp. 45, 48 (D.R.I. 1984), *aff'd*, 760 F.2d 257 (3d Cir.1985). *See generally* Restatement of Contracts (Second) § 205, comment f (1981); Williston, § 662. Here, the word "piece" is printed at those points in the contract at which its meaning is in question. The four typewritten usages, however, are all defined as "one or more scaling segments." Defendant is unable to point to any other definition within the contract. Nor has it argued that the minimum piece specifications of Section A2, column four, cannot be applied on a whole log basis. Given the fact that Columbia River billed plaintiff for nine years, in effect applying plaintiff's interpretation of the contract, and since defendant had no difficulty determining the alleged underpayment, defendant would be hard pressed to argue that plaintiff's interpretation cannot be implemented. Each of these factors supports plaintiff's construction, and absent some good reason to the

contrary, plaintiff's interpretation should prevail.

This court's obligation is to determine the parties' intent, as expressed in the written words of the agreement. The parties' intent, however, is to be gathered "from the whole instrument read in light of the circumstances existing at the time of negotiations leading up to its execution." *Miller v. Robertson*, 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed. 265 (1924). *See also Alvin Ltd. v. USPS*, 816 F.2d 1562, 1565 (Fed.Cir. 1987) (parties' intent gathered from instrument as a whole, from perspective of reasonable person acquainted with contemporaneous circumstances). There is no suggestion here that the contract in question was the subject of negotiation; quite the contrary. Nevertheless, it is conceded by defendant that the 1973 changes were a direct response to the dispute surrounding form contract 2400–5. Consequently, those circumstances are relevant here.

During the dispute concerning the earlier contract, the parties initially took positions substantially different from their current positions on how net scale was determined. Defendant eventually conceded that a literal reading of old Section A2 required application of the net scale test on a scaling-segment basis. It nevertheless remained adamant on one point: defendant's original intent had been that minimum specifications would apply to the whole log. In a Forest Service Memorandum of June 29, 1973, plaintiff was told,

> Historically, *we have always scaled logs by the piece regardless of whether the net volume was a composite of one, three or four* segments.... There was never any intention that the minimum specifications would apply to each segment. This intent was firmly established with industry representatives during several Industry-Forest Service Contract Work Sessions.... There still was no intention that the net scale volume would be on any basis other than by the log, whether one or three segments. (Emphasis added.)

Even more telling is the letter written to plaintiff on July 19, 1973, immediately before the changes in question led to the present form of contract 2400–6. After iterating that the Forest Service has always scaled logs by the piece regardless of the number of segments, the Forest Supervisor for Mt. Hood gives a definition of the term piece: "log, whether one or multi-segment." He repeats that there was "never any intention that the minimum specifications would apply to each segment."

These items of correspondence are extremely important for a number of reasons. First, it is apparent that immediately prior to the September 1973 changes, defendant took the view that a piece was a whole log. No suggestion was made at the time that the definition was limited to net scale determinations. Second, in light of defendant's present assertion that "common trade usage and interpretation" supports its position, it is more than a little ironic that in 1973 it represented that it conducted work sessions with industry which "firmly established" that minimum specifications applied to the log rather than the scaling segment. Third, contrary to defendant's present argument that these memoranda relate solely to questions of determining "net scale," both writings specifically encompass all "minimum specifications." Remarkably enough, the CO's decision of July 29, 1985 confirms most of these statements in setting out defendant's position: "B. Because the intent of the Forest Service at that time was that the minimum specifications standards would be based on the whole log, changes were made in 2400–6 (9/73) contract form to reflect our intent."

Taking this consistent set of documents at face value, it is clear that the 1973 changes were an effort to impose defendant's earlier position by unilateral contract change, namely, that minimum specifications apply on a whole log basis. Defendant does not contest this scenario, but attempts to limit the effect of the change. A key to defendant's argument is that the reference in all three documents to "minimum specifications" means only the "minimum net scale test." In its June 6, 1986

brief, defendant states that "minimum specification standards, or as they have been called in this brief 'minimum net scale' requirements, are not at issue in this case." While the court recognizes that the net scale test is not directly at issue, defendant provides no support for its assertion that this test is exclusive of any other "minimum specification standards." The record is to the contrary. In form contract 2400–5, to which the May and July 1973 writings had reference, minimum specifications of Section A2 encompass the parameters of length, diameter, and net scale in percentage of gross scale, as well as minimum net scale. It is noteworthy that the title to that section was "Volume Estimate and Utilization Standards." Current Section A2 uses that same title and similarly uses the concept of minimum specifications to include diameter, length, and net scale in percentage of gross scale. What is currently *omitted* from minimum specifications is minimum net scale, now incorporated under SPECIES AND PRODUCT. This is the very criteria which defendant now argues is the exclusive meaning of "minimum specifications." To suggest, as defendant does, that minimum specifications have nothing to do with diameter, length, and net scale in percentage of gross scale is a totally unfounded interpretation of the record.

The imprecision made possible by the contract in question, and defendant's approach to it are reflected in defendant's June 6 brief. In the process of attempting to draw a distinction between minimum specification standards (read, "minimum net scale") and minimum utilization standards, defendant refers to "minimum utilization specifications." Government's Opposition Brief at 5. Defendant's use of the terms interchangeably is understandable in view of the structure of Section A2. The only reasonable interpretation of the earlier and present version of that section are that the minimum specifications of columns three and four are the "Utilization Standards" referred to in the title to that section and in Section B2.2. (See note 3 *infra*.)

The decision of Judge Wood in the earlier litigation in some measure supports plaintiff's view. While the issue there was the application of the "minimum net scale" requirement to a differently worded contract, the term "piece" did come up on one occasion in the opinion. At page 15, Judge Wood describes plaintiff's position: "Plaintiff contends that under the clear and unambiguous terms of its contracts, scaling was required to be conducted on a segment basis, rather than 'by the piece,' *i.e.* by the whole log." The term "piece" was not used in the contract there being construed. Nor is it apparent whether the definition of piece is only the plaintiff's, or also the court's. At a minimum, in any event, it is apparent that the court did not question the plaintiff's usage, and that it was plaintiff's view as early as October 1979 that piece meant the whole log. Once again, this construction is understandable in light of defendant's July 19, 1973 letter defining piece as a multi-segment log.

The court does not accept defendant's argument that common trade usage and interpretation support its view. Initially, the court would observe that defendant's position as to custom and trade usage is not appropriate when the contract terms are unambiguous. *Sea-land Service, Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977); *Lomas & Nettleton Co. v. United States*, 1 Cl.Ct. 641, 644 (1982). Defendant's position throughout has been that the contract's meaning is clear. In any event, neither basis for the argument is persuasive. One is the defendant's own opinion as reflected in the CO's decision. As discussed earlier, the CO's decision is not totally consistent with defendant's argument. To the extent it can be construed as incompatible with plaintiff's position, however, it is the CO's unsworn, unsubstantiated allegation. Defendant itself correctly refers to the decision as merely the "Service's interpretation."

Defendant's second bit of support is drawn from the National Forest Products Association's Buyer's Guide to Forest Service Timber Sale Contracts (2nd ed. 1974). Defendant makes no effort to give this

document evidentiary status. It simply appears in defendant's brief along with the undocumented assertion that the association is the principal group representing the timber products industry. Absent some affidavit or stipulation, the court has no meaningful way to evaluate the association's comment. Even assuming it had to be considered, however, the court declines to attach any significance to the citation. On the face of it, the statement does not purport to reflect common trade usage. It only gives an interpretation contemporaneous with the September 1973 change. Rather than being a reflection of how the timber industry has construed new Section A2, it is a recommendation by a non-party for future interpretation. Finally, the statement relied on by defendant—"A piece is a portion of a tree bole which meets the size and defect specifications [of] A2, regardless of its utility for product use,"— can be seem as consistent with plaintiff's interpretation. Column three of Section A2, for example, states that minimum tree specifications include one minimum piece. Under plaintiff's interpretation, these statements could be read as "minimum tree (bole) specifications include one or more scaling segments." Defendant's reliance on common trade usage or interpretation is therefore unavailing.

In sum, the court concludes that contemporaneous circumstances, and the facts that there is only one definition of "piece" in the contract, that the definition was typed in later than the terms in question, and that plaintiff's interpretation can be and has been applied in practice, all support plaintiff's interpretation.

In view of the court's conclusion, it is not necessary to rely on the rule of construction of *contra proferentem*, that is that the contract should be given an interpretation favorable to the non-drafting party. *See Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 289, 475 F.2d 583, 587 (1973); *Firestone Tire & Rubber v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). Application of the rule here would confirm plaintiff's interpretation, however. Although both parties strongly urge that there is no ambiguity in the contract, in fact it is more than arguable that the defendant's failure when making the revisions in 1973 either to provide a separate definition for the printed term "piece," or to place asterisks at all points where the word appears resulted in an ambiguity. In any event the court finds in view of: the reasonableness of an assumption that a single word has the same meaning throughout a contract, defendant's earlier insistence that specifications applied to the whole log, the fact of the revision itself after the dispute over form 2400–5, and that plaintiff apparently held its present view at least as early as 1979, that the ambiguity was latent, not patent, that plaintiff's interpretation is reasonable, and that therefore, plaintiff's interpretation should be favored. *See Turner Const. Co. v. United States*, 819 F.2d 283, 286 (Fed. Cir.1987). The defendant's poor draftsmanship has now produced two lawsuits, and will no doubt continue to be fertile ground for misunderstandings unless the contracts in question are more comprehensively and carefully drafted. In any event, the consequences of that imprecision should not be borne by plaintiff.[4]

---

**4.** The parties cannot agree on whether this case generates a question of scaling practices (defendant) or pricing (plaintiff). This is due to the parties' disagreement over whether "utilization" in the title to Section A5 refers to an obligation to cut a tree in the first instance and present it for scaling (defendant) or to the obligation to treat the resulting cut product as merchantable timber, subject to MBF rates under Section A5 (plaintiff). Although the significance of this disagreement has not been argued, the court concludes that both views are basically correct. Section B2.2 refers to Section A.2 as creating a minimum threshold obligating removal. *See also* Section B.4. The very title to column three, "MINIMUM TREE SPECIFICATIONS INCLUDE ONE MINIMUM PIECE," incorporates by reference all of column four. Thus, although column three appears to refer to standing timber, it is inextricably tied to requirements relating to cut timber. Section B2.2 in any event obligates the purchaser to present for scaling all pieces that meet minimum piece standards, i.e., specifications of column four of Section A2. Assuming the scaling process bears out the initial guess that a tree meets specifications by having at least one suitable scaling

Defendant's further arguments are without merit. Consequently, plaintiff's motion for summary judgment is granted. Defendant's motion for summary judgment is denied. The clerk is directed to enter judgment on behalf of plaintiff in the amount of $7,887.57, plus interest from May 16, 1985, in accordance with 41 U.S.C. § 611 (1982). Costs to plaintiff.

segment it must be paid for as merchantable timber. The initial obligation to cut, the obligation to present for scaling, and the type of payment made are all thus interrelated. To the extent, however, that defendant argues that there is a more limited meaning inherent in the term "utilization," the court finds that there is a latent ambiguity presented, for which defendant is responsible and for which it should bear any ill consequences.