**KENNETH REED CONSTRUCTION
CORPORATION**

v.

**The UNITED STATES.**

No. 144-70.

United States Court of Claims.

March 16, 1973.

V. Keith Young, Orlando, Fla., Atty. of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

This case was referred to Trial Commissioner H. D. Cooper with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under Rule 166(c). The commissioner has done so in an opinion and report filed on December 4, 1972, wherein such facts as are necessary to the opinion are set forth. On February 16, 1973, the parties hereto filed a joint motion requesting that the court adopt the report of the commissioner and enter judgment in accordance therewith.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, it hereby adopts the same as the basis for its judgment in this case, as hereinafter set forth, without oral argument. Therefore, plaintiff's motion for summary judgment is

granted as to Count I and denied as to Count III, and that part of the petition is dismissed. Defendant's cross-motion for summary judgment is denied as to Count I and is granted as to Count III. The case is remanded to the Corps of Engineers Board of Contract Appeals pursuant to Public Law 92–415 and General Order No. 3 for a period not to exceed 6 months, to afford the parties an opportunity to obtain an administrative resolution of the equitable adjustment to which plaintiff is entitled under Count I of its petition.

### OPINION OF COMMISSIONER

COOPER, Commissioner:

This action, in three counts, seeks review, in accordance with the standards prescribed in the Wunderlich Act,[1] of a decision[2] of the Corps of E of the Corps of Engineers Board of Contract Appeals (hereinafter referred to as ENG BCA) denying plaintiff's claims for an equitable adjustment. The case is before the court on cross-motions for summary judgment pursuant to Rule 163(b).

The subject contract (No. DA–08–123–CIVENG–63–57) was for the construction of a four-bay reinforced concrete spillway structure with four vertical steel lift gates, and other work. The structure, designated 65C, was to be constructed on Canal 38 (Kissimmee River), a phase of the central and southern Florida flood control project.

Count I of the petition seeks an equitable adjustment for additional work performed in constructing certain wooden forms used in pouring concrete under the subject contract. Count II is presented as an alternative to Count I and seeks further discovery and a de novo proceeding either in this court or on remand to the ENG BCA as to plaintiff's entitlement to an equitable adjustment for the additional work performed on the wooden forms. In Count III, plaintiff seeks an equitable adjustment

---

1. 68 Stat. 81, 41 U.S.C. §§ 321–322 (1970).

2. Kenneth Reed Constr. Corp., ENG BCA Nos. 2706 and 2707, 67–2 BCA ¶ 6556 and 68–2 BCA ¶ 7302.

for additional work required to repair admittedly defective vertical steel lift gates.

For the reasons stated hereinafter, plaintiff's motion as to Count I is granted and defendant's cross-motion is denied; and plaintiff's motion as to Count III is denied and defendant's cross-motion is granted. Since Count I is disposed of favorably to plaintiff, it is unnecessary to rule on the motions as to Count II.

### Count I

Much of the work under this contract involved the construction of forms and the pouring of mass concrete. It is with respect to the construction of the forms that plaintiff seeks an equitable adjustment. The essence of the claim under Count I is plaintiff's contention that it was required to construct the forms to tolerances that were not set out in the contract specifications and that were more restrictive than necessary to meet specified tolerances for the finished concrete.

Paragraph 4–16 of the specifications is entitled "Forms and Formed Surfaces." Subparagraph 4–16(a) provides:

a. General: Forms shall be true to line and grade, mortar-tight and sufficiently rigid to prevent objectionable deformation under load. That portion of the form in contact with the concrete shall not be of a material which interferes with the setting of the concrete. Where forms for continuous surfaces are placed in successive units, care shall be taken to fit the forms over the completed surface so as to obtain accurate alinement of the surface and to prevent leakage of mortar. Responsibility for their adequacy shall rest with the Contractor;

however, the type, shape, size, quality, and strength of all materials of which the forms are made shall be subject to specific approval. Bolts and rods used for internal ties shall be so arranged, that when the forms are removed, metal will be not less than 2 inches from any concrete surface. Wire ties will not be permitted. All forms shall be so constructed that they can be removed without damaging the concrete. All exposed joints, edges, and external corners shall be chamfered and dummy chamfers and false joints shall be used to provide a neat and uniform appearance, unless otherwise directed or indicated on the drawings.

The issue presented is whether the statement that "forms shall be true to line and grade" was intended to establish a standard of no deviations or zero tolerances for the forms.[3] If not, a second issue is what tolerances for the forms were to be allowed under the specifications?

The facts relevant to this count are undisputed. According to the testimony of plaintiff's president, prior to bidding on this project, he read the specifications, including ¶ 4–16(a), and was aware of the statement that the forms were to be "true to line and grade." But, according to his testimony, since "you cannot build anything in construction to a true line and grade," he considered that statement only from the standpoint of reading on to see what the rest of the paragraph specified. Finding no stated tolerances in the specifications for the wooden forms, but noting the tolerances in subparagraphs 4–16(b) and (c) for the finished concrete,[4] plaintiff's president testified that he selected tolerances for the forms that would "meet comfortably and flexibly the end prod-

---

3. The ENG BCA adopted this view, holding that "it could simply mean, as we think it does, that deviations from 'true' would not be permitted." This conclusion, involving an interpretation of the contract, is neither final nor binding on this court. Jack Stone Co. v. United States, 344 F.2d 370, 170 Ct.Cl. 281 (1965).

4. Subparagraph 4–16(b) of the specifications sets forth classes of surface finishes for the finished concrete and specifies acceptable tolerances for each class of finish. Subparagraph 4–16(c), entitled "Construction Tolerances," specifies the acceptable tolerances for variations in the line and grade of the concrete structure.

ucts requirements" and priced the contract on that basis. The tolerances selected were plus or minus one-eighth of an inch or a maximum of one-fourth inch. According to the uncontroverted testimony in this record, these tolerances for the forms would have enabled plaintiff to produce finished mass concrete within the specified tolerances.

Plaintiff undertook construction of forms within the tolerances it had unilaterally selected. However, prior even to the first pour, the Government resident engineer inspected the forms and required plaintiff to make further adjustments in their plumbness and alignment. This practice continued throughout the entire contract, with the resident engineer inspecting each form prior to each pour and, in the vast majority of cases, requiring further adjustments in the forms. Although plaintiff contends that the resident engineer required the forms to be built to a tolerance of one-sixteenth of an inch, or closer, the ENG BCA found that plaintiff was never required to build its forms to any specific tolerance. The ENG BCA accepted the testimony of the resident engineer who testified that he accepted each form only when, in his judgment, it was "on the money" or when it appeared to him "that the contractor had exercised reasonable effort to get the form plumb and straight and further effort by him would damage the form rather than further improve it." The resident engineer's assistant testified he was not aware of any permissible tolerances for the forms and, when asked what standard he used to accept or reject the forms, he replied that he "used the line and grade standard of plumb."

At no time was plaintiff allowed to pour concrete with forms constructed to its own selected tolerances.[5]

Plaintiff contends that the statement "forms shall be true to line and grade" was not intended to be taken literally and did not purport to establish the tolerances for the forms. Plaintiff further argues that since ¶ 4–16(a) did not establish tolerances for the forms, it was reasonable to look to subparagraphs 4–16(b) and (c) in which the tolerances for the finished concrete were set forth to establish reasonable tolerances for the forms.

In opposition to this interpretation, defendant asserts that ¶ 4–16(a) calls out a specific unambiguous technical requirement, viz, "forms shall be true to line and grade" and that the mandatory nature of this requirement did not permit the contractor to look to any other portion of the specifications to establish tolerances for the forms.

 In resolving this conflict in interpretation, it is a "fundamental precept of common law that the intention of the parties to a contract control its interpretation." Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551, 195 Ct.Cl. 21, 30 (1971). The parties' intent must be gathered from the instrument as a whole. AMP Inc. v. United States, 389 F.2d 448, 182 Ct.Cl. 86 (1968), cert. denied, 391 U.S. 964, 88 S. Ct. 2033, 20 L.Ed.2d 878; International Arms & Fuze Co. v. United States, 73 Ct.Cl. 231 (1931). To arrive at the meaning to be attributed to a provision, the language of a contract must be given that meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances. Firestone Tire & Rubber Co., supra; Hol-Gar Mfg. Corp. v. United States, 351 F.2d 972, 169 Ct.Cl. 384 (1965). Trade usage and custom in the business community within which the agreement was framed is a factor to be considered in ascertaining the meaning intended for a contrac-

5. The resident engineer did permit some deviations in some of the forms and, on a few occasions, permitted concrete to be poured with forms as much as one-eighth of an inch out of plumb and alignment. As to those forms, there is no evidence that the resultant concrete structure was anything other than entirely satisfactory.

tual provision. Gholson, Byars & Holmes Constr. Co. v. United States, 351 F.2d 987, 173 Ct.Cl. 374 (1965); W. H. Edwards Eng'r Corp. v. United States, 161 Ct.Cl. 322 (1963). If the meaning to be attributed to the provision in question is ambiguous or is not manifest from the four corners of the contract and if a reasonable man could reasonably interpret the contract in different ways, that interpretation will be given the document which is more favorable to the party who did not draw it. WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Peter Kiewit Sons' Co. v. United States, 109 Ct.Cl. 390 (1947).

■ These well-settled principles, when applied to the facts, lead to the conclusion that plaintiff's interpretation not only is a reasonable one but also coincides with the apparent intent of the parties.

The end product contemplated by the contract was a specified mass concrete structure with the wooden forms being but the means to be employed in achieving that end product. As to the end product itself, the specifications expressly permitted deviations in the line and grade, and specified tolerances for those deviations. Moreover, the specifications expressly permitted deviations in the surface finish of the concrete structure and specified tolerances for those deviations. In such circumstances, it would be unreasonable to assume that the parties intended to contract for a less-than-perfect end product but, at the same time, intended that the forms would be built with mathematical exactitude (a standard found by the ENG BCA impossible to achieve).

■ Nor does the language of ¶ 4–16(a) compel such an unreasonable interpretation of the specifications. Paragraph 4–16(a) is entitled "General," a title which implies that the statements contained therein are but statements of a general nature and are not necessarily,

intended to be taken in a strict or absolute sense. The relative, rather than absolute, nature of the statements in ¶ 4–16(a) is illustrated by the requirement that the forms be "sufficiently" rigid to prevent "objectionable" deformation. Statements such as these, coupled with the delegation of responsibility for the forms to the contractor,[6] indicate that ¶ 4–16(a) was intended merely to set standards of a generalized nature, with the contractor having responsibility for building the forms to meet the specific standards established for the finished concrete in the succeeding paragraphs. This interpretation not only gives a reasonable meaning to all parts of the instrument, but also is in keeping with the rule that where general and specific provisions are in any respect inconsistent, the provision that is specific controls over the provision which is general. Hol-Gar Mfg. Corp. v. United States, *supra*.

The evidence in the record, which stands uncontroverted, as to the trade practice in the construction industry further supports this interpretation. According to that evidence, it is not normal practice for contract specifications to set forth separate, specific tolerances for the forms. Nor are there tolerance "standards" for wooden forms, the usual practice being for the contractor to be guided in the construction of the forms by the tolerance limits set forth for the finished concrete. It further appears from the record that the range of acceptable tolerances on finished concrete varies widely, with the tolerances on certain types of concrete structures, *e. g., buildings, being more restrictive than the tolerances normally permitted on mass concrete structures such as that which is the subject of this contract.

Based on the foregoing, it is concluded that a reasonable reading of the specifications as a whole, in light of prevailing trade practices, is that the parties

---

6. This delegation of responsibility did not extend to the form materials. As to these, specific approval was required.

did contemplate reasonable deviations in the line and grade of the forms,[7] and that, in exercising its responsibility, the contractor was to be guided in the construction of the forms by the tolerances set forth for the finished concrete structure. Even were the specifications reasonably susceptible of another interpretation, plaintiff's interpretation, being a reasonable one, would be controlling in this case. WPC Enterprises, Inc. v. United States, *supra;* Peter Kiewit Sons' Co. v. United States, *supra.* This is particularly so where defendant's interpretation seeks to impose a standard impossible to achieve. Owens-Corning Fiberglas Corp. v. United States, 419 F. 2d 439, 459, 190 Ct.Cl. 211, 245 (1969).

■ Defendant argues that this interpretation of the contract is directly contrary to what was expressly intended by the specifications. At the hearing, defendant adduced testimony which established that in previous contracts of a similar nature, the specifications provided that "forms shall be true to line and grade, within allowable tolerances for concrete surfaces." According to defendant's witness, the phrase "within allowable tolerances for concrete surfaces" was deleted in the subject contract to avoid difficulties experienced on other construction projects in which tolerances for the forms had been based on those specified for the finished concrete. However, there is no evidence in the record that plaintiff was aware of the previous problems encountered by defendant. Nor is there any evidence that plaintiff was aware either that its contract represented a departure from earlier contracts or that defendant intended, by the noted deletion, to impose a tolerance standard higher than was customary. It is, of course, well-settled that the subjective, unexpressed intentions of one party are not binding on the other. *Firestone Tire & Rubber Co., supra;* Singer-General Precision, Inc. v. United States, 427 F.2d 1187, 1193, 192 Ct.Cl. 435, 446–447 (1970). If it was the intention of defendant to alter existing trade practices and require that the wooden forms be constructed to tolerances more restrictive than customary, it had the obligation to so state in clear and unambiguous language. Tufano Contracting Corp. v. United States, 356 F.2d 535, 174 Ct.Cl. 398 (1966). It did not do so in this case.

■ This leaves then the question of whether plaintiff is entitled to recover compensation for the work required to adjust the forms to the standards imposed by the resident engineer. From a review of the record and the briefs, it appears that defendant does not challenge plaintiff's assertion that its proposed tolerances for the forms would have produced an acceptable finished concrete structure. Nor is there any dispute that the resident engineer, by holding plaintiff to a standard of "on the money," employed a standard more restrictive than was customary. This court has previously held that the imposition on a contractor of tolerances not set forth in the contract and in excess of those normally employed on jobs of a similar character is an unwarranted interference in the performance of the contract and the contractor is entitled to be compensated for the extra costs in endeavoring to comply with the standards imposed. WRB Corp. v. United States, 183 Ct.Cl. 409, 445, 487, 490 (1968). So also here, plaintiff is entitled to compensation for the extra costs it incurred in adjusting its forms to comply with the standards imposed by the resident engineer.

*Count III*

The question presented under this count is whether the cost of repairing

---

7. The General Services Administration Board of Contract Appeals reached a similar conclusion in interpreting specifications which required "all standing marble shall be set straight and true in a verticle plain [*sic*] of perfect alignment." Norair Engr. Corp., GSBCA No. 1098, 65–2 BCA ¶ 5057. For a similar interpretation of the word "exact" in a contract where no tolerances were set out, *see* Roscoe Engr. Corp. & Associates, ASBCA No. 5743, 61–1 BCA ¶ 3063.

admitted defects in three of the spillway lift gates is chargeable to defendant.

The facts pertinent to this count are also undisputed.[8] Plaintiff subcontracted the work for fabrication of the lift gates to the Florida Steel Corporation and defendant was so advised. Government inspectors visited the plant where the gates were being fabricated and advised the supplier of what the Government expected in the way of a finished product. The inspectors visited the plant on several different occasions, but remained only a few minutes on each occasion. Prior to shipment of the gates to the jobsite, the inspectors visited the plant and inspected the gates after they had been completely assembled. The inspector who testified at the hearing said he found no deformity in the two assembled gates he inspected. The parties have stipulated that no Government inspectors, or other personnel, were in the supplier's plant at any time during assembly or disassembly of the gates and it is undisputed that plaintiff did not notify the Government when the gates were ready to be assembled and inspected.

The gates were delivered to the jobsite in a disassembled condition, having been hauled there by truck and unloaded by crane. Plaintiff's superintendent apparently casually inspected the gates during unloading but did not observe any obvious defects. The gates remained at the jobsite at least 4 months before they were assembled. When the gates were bolted together for the first time, defects in three of the gates were readily discernible. There is no dispute concerning the extent of the defects, the only argument being as to who should bear the expense of repairing the defects.

The ENG BCA rejected plaintiff's claim, concluding that, under the contract, responsibility for the gates rested on plaintiff and that the cost of repairing the gates was to be borne by plaintiff.

We agree with the Board's conclusion. Plaintiff agreed to furnish and install vertical lift gates, a responsibility which it could not escape merely because it subcontracted part of the work. The contract expressly states that, unless otherwise provided, acceptance was to be made "after completion and inspection of all work required by this contract."[9] All inspections, except shop inspections, were to be made at the site of the work.[10] As to shop inspections, the technical specifications provided that "the acceptance of any material or finished member by an inspector shall not prevent subsequent rejection if such material or finished member is later found to be defective" and that "the Government reserves the right to reject any material at any time before final acceptance of the structure."[11] There is no dispute that the defective gates were rejected before final acceptance of the structure.

Plaintiff argues, however, that ¶ 7–14 of the technical specifications required defendant to make an assembly inspection,[12] and that defendant's failure to inspect resulted in patent defects

---

8. The recitation of facts is drawn from the opinion of the ENG BCA.

9. General Provision 10(f).

10. General Provision 10(a).

11. Part III, Technical Provisions, Section 7, ¶ 7–12.

12. This paragraph provides as follows: "SHOP ASSEMBLY: Unless otherwise specified, each machinery and structural unit furnished shall be assembled in the shop to determine the correctness of the fabrication and matching of the component parts. The tolerances shall not exceed those shown on the drawings and each unit assembled shall be closely checked to insure that all necessary clearances have been provided and that binding does not occur in any moving part. Assembly and disassembly work shall be performed in the presence of a Government inspector, unless waived in writing by the Contracting Officer, and any errors or defects disclosed shall be immediately remedied by the Contractor, without cost to the Government. Before disassembly for shipment, each piece of a machine or structure shall be match-marked to facilitate erection in the field. The location of

passing undetected. Plaintiff further argues that if defendant had met its contractual obligation, these defects would have been discovered and corrected at the plant instead of at the jobsite, where the corrections were more costly.

■ The provision providing for assembly and disassembly work to be performed in the presence of a Government inspector simply gave the Government the right to be present when this work was being performed and, hence, was for the benefit of the Government and could be waived by the contracting officer. While it is true that the Government did neither in this case, the failure of defendant to exercise its contract rights does not relieve plaintiff of its responsibilities under the contract. Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968); *cf.* Russell R. Gannon Co. v. United States, 417 F.2d 1356, 189 Ct.Cl. 328 (1969).

Nor is plaintiff in any position to complain about the absence of inspectors during the assembly work. Under the terms of the contract, plaintiff was required to "keep the Contracting Officer informed as to the commencement and progress of the work." [13] The president of plaintiff admitted that he did not inform defendant when the assembly and disassembly of the gates would take place. Nor, so far as it can be determined from the record, did plaintiff make any effort to comply with General Provision 31 [14] and maintain inspection procedures of its own at the subcontractor's plant. Under these circumstances, there is no basis whatever for plaintiff asserting it was damaged by the defendant's failure to dispatch an inspector to view the assembly and disassembly.

Plaintiff places heavy reliance on Southwest Welding & Mfg. Co. v. United States, 413 F.2d 1167, 188 Ct.Cl. 925 (1969). The only common factor between this case and the *Southwest Welding* case is that, in both cases, defects were discovered after offsite inspections had been conducted. However, in the *Southwest Welding* case, offsite inspections were specifically authorized and such inspections were, under the terms of the contract, to be final and conclusive.

In the present case, the inspections of the gates did not occur "during" assembly and disassembly and, hence, were not covered by ¶ 7–14. The inspections that were made were either shop inspections under ¶ 7–12, or an inspection not authorized in writing under ¶ 10(a). In either case, the contract expressly disclaims any finality for such inspections.

The ENG BCA was correct as a matter of law in interpreting the contract provisions applicable to plaintiff's claim in Count III of its petition, and plaintiff has failed to demonstrate that the Board's findings of fact are arbitrary, capricious or not supported by substantial evidence.

For the reasons stated, plaintiff is not entitled to recover on Count III of its petition.

## CONCLUSION

For the foregoing reasons and upon the law and the evidence in the administrative record, plaintiff's motion for summary judgment is granted as to Count I and denied as to Count III, and that part of the petition is dismissed. Defendant's cross-motion for summary judgment is denied as to Count I and is granted as to Count III. The case is remanded to the Corps of Engineers Board of Contract Appeals pursuant to Public Law 92–415 and General Order No. 3 for

match-marks shall be indicated by circling with a ring of white paint after the shop coat of paint has been applied, or as otherwise directed." ·

13. Technical Provisions, ¶ 7–12.

14. "31. CONTRACTOR INSPECTION SYSTEM (NOV. 1961)

The Contractor shall (i) maintain an adequate inspection system and perform such inspections as will assure that the work performed under the contract conforms to contract requirements, and (ii) maintain and make available to the Government adequate records of such inspections."