**GRANITE CONSTRUCTION CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 398–89C.**

United States Claims Court.

April 17, 1991.

Adrian L. Bastianelli, Washington, D.C., for plaintiff.

Thomas McLish, Washington, D.C., with whom were Asst. Atty. Gen. Stuart M. Gerson, Director David M. Cohen, Asst. Director Thomas W. Petersen and Scott Ray, for defendant.

OPINION

LYDON, Senior Judge:

This Wunderlich Act review case is before the court on the parties' cross-motions for summary judgment. The court must decide whether the Corps of Engineers Board of Contract Appeals (ENGBCA or Board) erred in finding that the contractor Granite Construction Company (Granite) was not entitled to recover damages claimed for removal and replacement of non-conforming materials on a concrete

lock and dam under construction. After consideration of the parties' submissions and oral argument, heard on April 12, 1991, the court grants defendant's motion for summary judgment, for the following reasons.

## FACTS

The facts as found by the Board are summarized below. On October 26, 1976, Granite Construction Company (Granite) entered into a contract with the U.S. Army Corps of Engineers (Corps) for construction of a lock and dam located near Aberdeen, Mississippi. The contract was worth approximately $36 million. The contract terms required construction of concrete monoliths to form the lock walls and dam. Each monolith is composed of several concrete "lifts" about five feet high. When completed, the monoliths are about sixty feet high, forty-two feet long, and thirty feet wide. Adjacent monoliths were to be separated by small gaps or joints.

The contract required polyvinylchloride (PVC) waterstop to be embedded in the vertical joints between monoliths. The parties' dispute arises from the Corps' rejection of the waterstop, after about ten percent of it had been embedded in concrete, when it was discovered that the waterstop failed to meet contract specifications. The PVC waterstop Granite used for this project came in fifty-foot rolls. The waterstop is nine inches wide with a center bulb ¾ inch thick. Ribbed flanges on either side of the waterstop are embedded in the concrete, with the center bulb in the joint. The flanges are ⅜ inch thick, with lengthwise ribs. The vertical waterstop is installed about eighteen inches inside the face of the monolith. The waterstop is keyed into the ground at the foundation, and it runs vertically almost to the top of the monolith. The purpose of the waterstop is to prevent water from leaking through the joints of the lock and dam.[1]

About half (four inches) of the waterstop is placed in the wet concrete during construction of the monolith. As the concrete hardens, it holds the waterstop. Next, the contractor pours the concrete for the adjacent monolith around the other half of the waterstop. The resulting monoliths have about a one-inch gap between them, filled by the waterstop.

The lock walls contain water tunnels called culverts running through them, which are about twelve and a half feet square, for emptying and filling the lock chambers. Waterstop is required to be installed around the culverts at each vertical monolith joint.

Paragraph 14.3 of the contract specifications provides, in part:

> 14.3 **Waterstops.** Waterstops of rubber or of polyvinylchloride (PVC) shall be installed in joints as shown on the drawings or as otherwise directed. The type of material, location, dimensions, and method of installation shall be as shown on the drawings. In order to eliminate faulty installation that may result in joint leakage, particular care shall be taken to see that the waterstops are correctly positioned during installation. The bottom of each waterstop shall be embedded in the foundation as shown on the drawings. All waterstops shall be installed so as to form a continuous watertight diaphragm in each joint....

This paragraph further provides that PVC waterstops shall conform to the requirements of CRD–C 572. CRD–C 572–74 provides, in part:

> 2.1 Waterstop. The waterstop shall be of the shape and dimensions shown on the drawings accompanying the project specifications.
>
> 3. Inspection and Testing.
>
> 3.1 All material and all waterstop will be subject to rigid inspection and testing in order to insure that the supplied waterstop meets the requirements of these specifications. Every facility shall be provided for representatives of the Government to perform careful sampling and inspection of the finished waterstop.

---

**1.** Plaintiff argues that the function of the waterstop is strictly cosmetic, to prevent public alarm at the sight of water leaking through the dam.

The sampling of finished waterstop and all testing of finished waterstop, and job-made splices will be done by the Government.

Contract provision CRD–C 572–74, quoted above, also contains detailed requirements for testing samples of finished waterstop, including tensile strength, ultimate elongation, low temperature brittleness, stiffness in flexure, and accelerated extraction. Paragraph 8 of this provision warns that "the waterstop may be rejected if it fails to meet any of the requirements of these specifications."

Paragraph 14.3 further provides:

14.3.3 **Testing.** The contractor shall submit samples of non-metallic waterstops and samples of job-made and factory-made splices of nonmetallic waterstops for inspection and testing in accordance with CRD–C 513 and 572. The testing of the samples of waterstops and splices shall be performed by and at the expense of the Government. If a sample fails to meet the specification requirements the waterstop or splicing method will be rejected and new samples shall be submitted for inspection and testing. The cost of retesting will be deducted from payments due to the contractor. . . .

14.3.3.1 **Samples of Waterstop Material.** Each sample shall be a piece not less than 12 inches long cut from each 200 feet of finished waterstop furnished. Each sample shall be identified to indicate the manufacturer, size, type of material, and quantity of material and shipment [the] sample represents.

.    .    .    .    .

Adequate provisions shall be made to support and completely protect the waterstops during the progress of the work. The contractor shall replace and repair, at his expense, any waterstop punctured or otherwise damaged before final acceptance of work. . . .

14.3.2 **Splices.** All joints in the waterstop shall be spliced together to form a continuous watertight diaphragm in each joint.

14.3.2.1 **Non–Metallic Waterstops.** All splices shall be neat with the ends of the

jointed materials in true alignment. . . . The continuity of the characteristic members of the cross sections of the waterstop design ribs, ribs, tabular center axis, protusions [sic], and the like [sic] be maintained across the splice.

The contract also contains General Provisions (GP) and Special Provisions (SP) with regard to inspection and testing of materials and workmanship. Clause GP–10 entitled "Inspection and Acceptance" provides, in part:

(a) Except as otherwise provided in this contract, inspection and test by the Government of material and workmanship required by this contract shall be made at reasonable times and at the site of the work, unless the Contracting Officer determines that such inspection or test of material which is to be incorporated in the work shall be made at the place of production, manufacture or shipment of such material. . . .

(b) The contractor shall, without charge, replace any material or correct any workmanship found by the Government not to conform to the contract requirements, unless in the public interest the Government consents to accept such material or workmanship with an appropriate adjustment in contract price. The contractor shall promptly segregate and remove rejected material from the premises.

.    .    .    .    .

(d) The contractor shall furnish promptly without additional charge, all facilities, labor, and material reasonably needed for performing such safe and convenient inspection and test as may be required by the Contracting Officer. All inspection and test by the Government shall be performed in such manner as not unnecessarily to delay the work. Special, full size, and performance tests shall be performed as described in this contract. . . .

General Provision 9 provides:

9. MATERIAL AND WORKMANSHIP (1964 JUN).

(a) Unless otherwise specifically provided in this contract, all equipment, material, and articles incorporated in this work

covered by the contract are to be new and of the most suitable grade for the purpose intended.... The contractor shall furnish to the contracting officer for his approval the name of the manufacturer, the model number, and other identifying data and information respecting the performance, capacity, nature, and rating of the machinery and mechanical and other equipment which the contractor contemplates incorporating in the work.... The contractor shall furnish the contracting officer for approval full information concerning the material or articles which he contemplates incorporating in the work....

General Provision 32 requires the contractor to implement and maintain an effective work inspection system:

32. CONTRACTOR INSPECTION SYSTEM (1964 NOV)

The contractor shall (i) maintain an adequate inspection system and perform such inspections as will assure that the work performed under the contract conforms to the contract requirements, and (ii) maintain and make available to Government adequate records of such inspections.

The Special Provisions of the contract require the contractor to implement and maintain a quality control system:

SP–38. CONTRACTOR QUALITY CONTROL: The Contractor shall provide and maintain an effective Quality Control System that complies with General Provision 32 of the contract entitled "Contractor Inspection System."

(a) The contractor shall establish a Quality Control System to perform sufficient inspection and tests of all items of work, including that of his subcontractors to insure conformance to applicable specifications and drawings with respect to the materials, workmanship, construction, finish, functional performance, and identification. This control shall be established for all construction work performed pursuant to the contract. *Where the technical provisions of the contract provide for Government quality control or assurance by inspections or test-*

*ing, it shall not relieve the contractor from the responsibility of doing such testing or inspection as is necessary to assure himself or the Government that the specifications are being met ....* (emphasis added)

(b) The Contractor's Quality Control System is the means by which the contractor assures himself that his construction complies with the requirements of the contract plans and specifications....

On March 4, 1977, Granite ordered 7,100 linear feet of PVC waterstop from Vimco of Laurel, Maryland, at a total price of $5,752.80. Vimco obtained the waterstop from Saf–T–Grip Specialties (STG). Upon inquiry, Granite learned that the Corps wanted four one-foot samples, as well as splices of the waterstop for testing. After receiving the samples from STG, which were black in color, Granite forwarded them to the Corps for testing on or about April 20, 1977. After testing, the Corps informed Granite, on July 18, 1977, that the samples met the contract requirements of CRD–C 572–74.

On September 6, 1977, STG requested permission to supply the "very same material" that the Corps had tested and approved, but the color would be green instead of black. STG explained that the color of the waterstop was changed periodically for inventory purposes. When Granite relayed this request to the Corps, the Corps became concerned that the waterstop would not be the same material as the tested samples. Consequently, STG executed a certification, on September 16, 1977, that the material to be shipped to Granite would be from the same lot and compound as the tested samples. On October 4, 1977, Granite's office engineer Bob Murray certified to the Corps that STG's certification was correct. Ultimately, however, STG's request to ship green rather than black waterstop was withdrawn. The record indicates that the Corps relied on these certifications in determining that no further testing of the waterstop would be necessary after delivery to the jobsite.

In a memorandum from the Corps' area engineer to the Corps' resident engineer,

dated November 1, 1977, the issue of responsibility under the contract for testing waterstop was addressed:

Quality assurance testing by the Government falls into two categories:

a. Those tests that are solely the responsibility of the Government, and

b. Those tests that are required to insure the effectiveness of the Contractor's quality control program.

Those materials that are to be tested by the Government and that are not part of the Contractor's quality control program are ...

c. *Waterstops.* This material is tested by [the Corps' Waterway Experiment Station] in accordance with procedures outlined in the specifications, CRD–C 513 and CRD–C 572....

Granite received the first shipment of waterstop in October of 1977, and billed the government for 7,100 linear feet of waterstop on November 28, 1977. On November 19, 1977, Granite's quality control engineer certified that all material stored on the jobsite for which payment had been requested met all the specifications and requirements of the contract.

During a routine inspection of Granite's storage area in November of 1977, the Corps' Mr. Baker looked at the shipment of waterstop, but he did not measure, check or sample the material at that time.

At the subsequent administrative hearing before the Board, Granite's personnel testified that they assumed the Corps had sampled and tested the waterstop after it arrived on the jobsite, in accordance with contract provision CRD–C 574–72. Granite was unaware that the Corps did no further testing of the waterstop between October of 1977 and June of 1978. However, Granite did not submit any waterstop samples to the Corps for testing during this period. Moreover, Granite provided certifications to the Corps that the waterstop to be embedded in the concrete was the same material the Corps had already tested and approved. This fact seems to indicate that Granite knew the Corps did no further testing of the waterstop after the initial testing and approval.

On April 3, 1978, Granite began embedding the waterstop in the concrete monoliths. Shortly thereafter, during a visual inspection of the embedded waterstop, the Corps notified Granite of waterstop problems in the nature of cross-sectional area and dimensional differences within the material. When Granite contacted STG in this regard, STG responded by certifying, on April 27, 1978, that the waterstop was "manufactured at one time from one lot and shipped complete to the above project."

Around the end of May, 1978, Granite became aware that it had not received the full 7,100 feet of waterstop it had ordered, and for which it had paid the supplier. STG agreed to send a second shipment immediately, and the waterstop was delivered on or about June 1, 1978. On that date, STG certified that the second shipment was from the same lot and compound as the first shipment, and explained that the waterstop had been inadvertently overlooked in the warehouse.

On or about May 30, 1978, the Corps informed Granite it would take about thirty days to test the second shipment of waterstop. Upon testing samples from the second shipment, the Corps found that only one out of the five samples tested met both tests of ultimate elongation and tensile strength. Granite was informed of the negative test results on June 19, 1978.

Because Granite had repeatedly certified that both shipments of waterstop were from the same lot, the Corps informed Granite on June 22, 1978 that all waterstop was rejected. At this point, Granite maintained that the two shipments were from different lots, and requested further testing of samples from the first shipment. On June 26, 1978, the Corps told Granite that samples from the first shipment had failed testing.

Granite ceased concrete operations on June 22, 1978. At that time, Granite had placed about 800 feet of waterstop in concrete, slightly more than ten percent of the total 7,100 feet of waterstop. The concrete

pours were on the critical path.[2] The parties disagree as to whether it was necessary for Granite to shut down its concrete operations.

The parties immediately agreed to obtain 5,000 feet of Vinylex waterstop, which previously had been approved by the Corps for use on other projects. Near the end of June, 1978, Granite proposed a "cut and splice" method to correct the waterstop problem, which involved splicing Vinylex waterstop onto the STG waterstop already embedded in the concrete. However, the Corps rejected the "cut and splice" method because it was not a "true repair" of the defective material, and because the physical characteristics of the two types of waterstop did not match. Contract provision 14.3.2.1 requires the continuity of the physical characteristics of spliced waterstop materials to be maintained across the splice.

Granite requested that the Corps provide it with design criteria or calculations for the waterstop, so Granite could hire a consultant to determine whether the STG waterstop was adequate for its intended purpose, but the Corps felt it was unnecessary, since the Corps would accept nothing less than complete removal and replacement of the STG waterstop. At the administrative hearing before the Board, the Corps explained that waterstop is an "off the shelf" item that is not specifically designed for individual dams.

On June 26, 1978, after meeting with a Granite representative, the Corps' resident engineer noted in his diary: "Contr[actor] wants to know [if] the Gov[ernment] will or can accept the waterstop recognizing its actual test value. Contr[actor] wants to know our criteria for accepting defective waterstop. Gov[ernment] advises they won't accept less than req[uire]d GP–10." The Corps' rejection of the STG waterstop apparently was premised on clause GP–10,

"Inspection and Acceptance," which requires the contractor to replace any material not conforming to contract requirements.

Granite's next proposal to correct the waterstop problem was a "rerouting" method, whereby Granite would embed additional conforming waterstop into the concrete, which involved some splicing with STG waterstop, but would cause minimal delay of concrete placement. The Corps rejected this and all other remedial proposals by Granite, because the STG waterstop did not meet contract specifications. The Corps required total removal and replacement of the STG waterstop. The Corps' position was confirmed in writing to Granite on June 28, 1978. Ultimately, the Corps did allow Granite to leave about 50 to 100 feet of STG waterstop embedded in the first lift of some monoliths, to avoid chipping large holes in the lifts.

Granite began removing and replacing the STG waterstop on or about June 22, 1978, and completed the task on October 6, 1978.

Granite sued all four waterstop suppliers in federal district court. Two of the suppliers settled with Granite for $400,000. Granite obtained a default judgment against the other two suppliers, in the amount of $897,000. Granite assigned its rights against the two defaulting suppliers to certain insurers. In addition, Granite agreed to pursue its claim against the Corps, and to split any recovery with the two settling suppliers.

Granite subsequently filed an administrative claim with the Board, and a trial was held in May of 1983. On December 19, 1988, the Board issued a split decision denying Granite's claim. One of the three judges on the panel concurred in part and dissented in part.[3] Granite filed an appeal

---

**2.** The "critical path" is a method of organizing and scheduling a complex project consisting of various interrelated small projects. Items of work that must be performed on schedule are on the "critical path." A delay of work along the critical path will affect the entire project. *Utley–James, Inc. v. United States,* 14 Cl.Ct. 804, 809 (1988) (quoting *Haney v. United States,* 230 Ct.Cl. 148, 167–68, 676 F.2d 584, 595 (1982)).

**3.** In essence, the dissenting judge concluded that the Corps was responsible for delay costs in failing to timely test the waterstop, and Granite was responsible for direct costs of removal and replacement of the non-conforming waterstop.

of the Board's decision in this court on August 14, 1988.

## DISCUSSION

### A. Standard of Review

The issue before the court is whether the Board's decision to deny plaintiff's claim comports with the standards set forth in the Wunderlich Act. In a Wunderlich Act case, the court's review is limited to the administrative record.[4] The court must uphold the Board's findings of fact unless they are fraudulent, arbitrary, capricious, so erroneous as to imply bad faith, or not supported by substantial evidence. 41 U.S.C. § 321. *See, e.g., Erickson Air Crane Co. v. United States*, 731 F.2d 810, 814 (Fed.Cir.1984); *B.D. Click Co. v. United States*, 222 Ct.Cl. 290, 296, 614 F.2d 748, 751–52 (1980); *Kaminer Constr. Corp. v. United States*, 203 Ct.Cl. 182, 191, 488 F.2d 980, 984 (1973); *Utley–James, Inc. v. United States*, 14 Cl.Ct. 804, 808 (1988). "Of course, consideration must be given to all of the evidence, that which militates against and that which supports the board's decision, but the board's decision must be upheld if there is substantial evidence to support such decision on the record as a whole." *Tecon Corp. v. United States*, 188 Ct.Cl. 436, 450–51, 411 F.2d 1271, 1279 (1969).

With respect to the Board's legal conclusions, the court is entitled to engage in *de novo* review. 41 U.S.C. § 322. *See, e.g., Erickson Air Crane, supra*, 731 F.2d at 814; *B.D. Click, supra*, 222 Ct.Cl. at 297, 614 F.2d at 752; *Kaminer Construction, supra*, 203 Ct.Cl. at 191, 488 F.2d at 984;

*Utley–James, supra*, 14 Cl.Ct. at 808–09. However, as a tribunal having considerable expertise in construction contract matters, the Board's legal determinations can be helpful to the court. *See United States v. Lockheed Corp.*, 817 F.2d 1565, 1567 (Fed. Cir.1987); *Erickson Air Crane, supra*, 731 F.2d at 814; *Utley–James, supra*, 14 Cl.Ct. at 809. In fact, the Board's decision on a question of law "is entitled to great weight if it is based on the Board's expertise and is not unreasonable." *Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1185 (1973).

### B. Review of the Board's Decision

■ Plaintiff's position is that the Board's decision is arbitrary and capricious in finding that Granite had the ultimate responsibility for ensuring that the waterstop met contract requirements. Plaintiff maintains that the Corps was required, under the contract, to timely test the waterstop material, and that its failure to do so caused plaintiff damages in excess of $3.5 million. In addition, plaintiff argues that the Corps had no right to insist on strict compliance with the contract specifications once the waterstop was embedded in the concrete, but must at that point consider a number of factors to avoid "economic waste."

Defendant urges the court to sustain the Board's decision that Granite had the ultimate responsibility for ensuring that the waterstop met contract specifications, and that the Corps had a right to insist on strict compliance with the contract.

---

**4.** The Wunderlich Act, 41 U.S.C. §§ 321–22, provides the following standard of review:

§ 321. *Limitation on pleading contract provisions relating to finality; standards of review*
No provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limited judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: *Provided, however,* That any such decision shall be final and conclusive unless

the same is fradulent [sic] or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
§ 322. *Contract provisions making decisions final on questions of law*
No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative, or board.
When the Wunderlich Act was succeeded by the Contract Disputes Act of 1978, 41 U.S.C. § 609, the standard of review remained the same. *Systems Technology Assocs., Inc. v. United States*, 699 F.2d 1383, 1386 n. 7 (Fed.Cir.1983).

The issue before the Board was whether plaintiff or defendant had the ultimate responsibility under the contract for assuring that the waterstop met contract requirements. This issue involves contract interpretation, which is a matter of law. *Government Systems Advisors, Inc. v. United States,* 847 F.2d 811, 812 n. 1 (Fed. Cir.1988); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916–17 (Fed.Cir.1984); *Fry Communications v. United States,* 22 Cl.Ct. 497, 503 (1991). In deciding that issue, the Board followed a well established rule of contract interpretation: "An interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless." *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985); *see also Fry Communications, supra,* 22 Cl.Ct. at 503. The Board concluded that, under the contract, Granite had the ultimate responsibility for ensuring that the waterstop meets contract requirements. The court is entitled to engage in a *de novo* review of this legal conclusion.

Plaintiff frames the issue before the court as whether the Corps had the responsibility to test the waterstop before it was embedded in the concrete. In support of its position that the Corps had the sole duty to test the waterstop, plaintiff points to contract provision CRD–C 572, quoted above, which states in paragraph 3.1 that "all waterstop will be subject to rigid inspection and testing" and in paragraph 14.-3.3 that "sampling of finished waterstop and all testing of finished waterstop and job-made splices will be done by the Government." Plaintiff argues that these provisions consistently state that testing of waterstop will be performed by and at the expense of the government. Plaintiff argues that these waterstop provisions are technical provisions, and therefore should prevail over the more general provisions regarding contractor inspection and quality

control systems. However, the court reads these contract provisions otherwise.

The general provisions in clause GP–10 of the contract place on the contractor the responsibility of ensuring, by means of a contractor inspection system, that the work performed on the project conforms to contract requirements, and to replace any nonconforming material without charge. More significant, however, are the special provisions of the contract which require the contractor to implement and maintain a quality control system. In particular, SP–38 specifically states that "where the technical provisions of the contract provide for Government quality control or assurance by inspections or testing, it shall not relieve the contractor from the responsibility of doing such testing or inspection as is necessary to assure himself or the Government that the specifications are being met." By its very terms, SP–38 establishes its priority over the more general technical provisions relating to government testing. It is the general rule in this court that specific contract provisions prevail over more general provisions when there is a conflict. *Kenneth Reed Constr. Corp. v. United States,* 201 Ct.Cl. 282, 290, 475 F.2d 583, 589 (1973); *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 396, 351 F.2d 972, 979 (1965). Were it not for clause SP–38 in the contract, plaintiff's position would likely carry more weight. This provision requires plaintiff to do more than "assume" that the Corps tested the waterstop after it arrived on the jobsite. Clause SP–38 places the onus on plaintiff to take whatever steps are necessary to ensure that the waterstop embedded in the concrete meets contract specifications. Unfortunately for plaintiff, it relied on erroneous certifications from its waterstop supplier that the waterstop it received met contract specifications. The above-quoted SP–38 clause prevents plaintiff, however, from shifting to the government the burden of ensuring that the waterstop complies with contract requirements.[5]

---

5. At oral argument, each party argued that the other side had the duty to obtain samples of waterstop for testing. A fair reading of the relevant contract provisions, when read together, points to a patent ambiguity. Paragraph 14.3.3 states "[T]he contractor shall submit samples.... for inspection and testing ...," whereas paragraph 3.1 states that "sampling ... will be

Paragraph 14.3.3 requires Granite to submit samples of the waterstop and splices to the Corps for testing. Granite did submit samples of the waterstop, obtained from the supplier, after Granite ordered the waterstop, but before Granite received delivery of the waterstop that was actually installed. There is no dispute that Granite failed to submit any samples of waterstop for testing between the time the waterstop was delivered to the jobsite and the time the Corps first noticed material differences in the waterstop that had already been embedded in concrete. The government admits it did not test samples from every 200 linear feet of waterstop, pursuant to paragraph 14.3. In explaining its reason for not testing every 200 feet of waterstop, the government points out that Granite provided certifications that the waterstop delivered to the jobsite was the same material as the samples of waterstop the Corps previously had tested and approved. In view of Granite's obligations, under the work inspection and quality control provisions of the contract, to ensure that its work and materials meet contract requirements, the government reasonably relied on plaintiff's certifications that the waterstop conformed to contract specifications.

■ Plaintiff reads the language of paragraph 3.1, which states "all waterstops will be subject to rigid testing and inspection" as mandating government testing. However, a strikingly similar clause was construed by the Court of Claims as giving the government a right, but not a duty, to inspect and test. *Kaminer Construction, supra,* 203 Ct.Cl. at 193, 488 F.2d at 986. In *Kaminer Construction,* the dispute involved the collapse of a steel derrick after government inspection and approval, caused by the contractor's use of bolts that were ⅛ inch too small. The court concluded that the clause "material to be furnished shall be subject to inspection and tests" without expense to the contractor signified

that the government had a right, rather than a duty, to conduct all-inclusive tests. "The right to inspect does not imply a duty to inspect." *Kaminer Construction, supra,* 203 Ct.Cl. at 193, 488 F.2d at 986. The contract also contained a provision mandating a contractor inspection system, which the court found to be more specific than the government's right to inspect clause. *Kaminer Construction, supra,* 203 Ct.Cl. at 195, 488 F.2d at 987. The court held that the defect was latent, and was not so obvious as to relieve the contractor of its duty to ensure proper construction. *Id.*

At minimum, the contract provisions give the Corps a right to inspect and test the waterstop. Even if the contract requires the Corps to inspect and test every 200 feet of waterstop, Granite is not thereby relieved of its responsibility to provide waterstop that conforms to the contract requirements. *See Kenneth Reed Construction, supra,* 201 Ct.Cl. at 294, 475 F.2d at 590. Granite admits the STG waterstop it removed from the concrete did not meet contract specifications. To interpret the contract otherwise would render meaningless clause GP–32, requiring a contractor inspection system, and clause SP–38, requiring a contractor quality control system. An interpretation that gives reasonable meaning to all parts of the contract is preferred to one that leaves parts of the contract meaningless. *Fortec Constructors, supra,* 760 F.2d at 1292; *Fry Communications, supra,* 22 Cl.Ct. at 503.

Plaintiff attempts to show that the parties intended for the Corps to be solely responsible for testing the waterstop by pointing to an intra-agency memorandum, dated November 1, 1977, from the Corps' area engineer to the Corps' resident engineer. Although the memorandum states that certain materials, including the waterstop, were to be tested by the government, and were not part of the contractor's quali-

done by the Government." Such an obvious discrepancy in the contract provisions in this regard gives rise to a duty on the contractor's part to make inquiry prior to bidding, and failure to do so precludes the court from considering the reasonableness of the contractor's inter-

pretation. *See Fortec Constructors, supra,* 760 F.2d at 1292; *Newsom v. United States,* 230 Ct.Cl. 301, 304, 676 F.2d 647, 649 (1982); *Beacon Constr. Co. v. United States,* 161 Ct.Cl. 1, 7–8, 314 F.2d 501, 504 (1963).

ty control system, there is no indication in the record that this was part of the parties' understanding. In fact, the memorandum appears to reflect no more than the understanding of one Corps engineer as communicated to another Corps engineer. There is no indication that the memo was directed to Granite, much less that it was part of the parties' agreement. The Board apparently considered this contention to be without merit, and did not address it. The court agrees.

■ Plaintiff next argues that, even though the Corps may be entitled to strict compliance with the contract terms before the waterstop is embedded in the concrete, the Corps has no right to insist on strict compliance with the contract terms once the waterstop is installed. After installation, plaintiff argues, the Corps "must consider the extent and nature of the defect, and the integrity and cost of repairs versus the cost of total removal and replacement." Because the cost of repairs allegedly exceeded $3.8 million, plaintiff argues it was "economic waste" for the Corps to require complete replacement of the STG waterstop, especially when the STG waterstop comprised only ten percent of the total waterstop in the project. Although Granite acknowledges that the STG waterstop did not meet contract specifications, as it averaged thirteen percent below specification requirements with regard to the primary tests of tensile strength and ultimate elongation, Granite nonetheless argues that the waterstop was adequate for its intended purpose. Plaintiff complains that the Corps did not even bother to evaluate whether the STG waterstop was adequate for its intended purpose. For these reasons, plaintiff argues that there is insufficient evidence for the Board's conclusion

that the Corps provided "cogent reasons for the need to replace the material."

The contract permits the government to reject waterstop that fails to meet any of the requirements of the contract specifications. CRD–C 572–74 ¶ 8.1. This provision reflects the general rule that the government, like any other party to a contract, "is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specification." *Cascade Pacific Int'l v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985); *American Elec. Contracting Corp. v. United States*, 217 Ct.Cl. 338, 350, 579 F.2d 602, 608 (1978); *Jet Constr. Co. v. United States*, 209 Ct.Cl. 200, 208, 531 F.2d 538, 543 (1976); *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 661–62, 505 F.2d 1257, 1263 (1974). The government has a right to insist on the contractor's compliance with the specifications, regardless of its reasons. *Farwell Co. v. United States*, 137 Ct.Cl. 832, 836, 148 F.Supp. 947, 949 (1957). It is not within a contractor's province to decide what materials are equally satisfactory and substitute its judgment for that of the government. *H.L.C. & Assocs. Constr. Co. v. United States*, 176 Ct.Cl. 285, 306, 367 F.2d 586, 598 (1966). In *Farwell*, the Court of Claims rejected the contractor's argument that the copper tubing it installed was as satisfactory as the copper pipe required by the contract. "It is of no concern to plaintiff why the Government specified brass or copper 'pipe' instead of 'tubing,' and it was not within plaintiff's province to substitute its judgment for that of the Government by deciding that tubing was satisfactory when pipe was specified." *Farwell, supra*, 137 Ct.Cl. at 836, 148 F.Supp. at 949. In the present case, it is undisputed that the STG waterstop embedded in the concrete failed to meet contract specifications.[6] Plaintiff's argument that the government failed to

---

**6.** The Board summarized the test results of the STG waterstop from the first shipment as follows:

*Tensile strength:* Two of the eight samples tested met the value set forth in the specifications. The other six samples averaged 13% below specifications.

*Ultimate elongation:* None of the samples tested met the value in the specifications. The samples averaged 13% below specifications. *Low temperature brittleness:* None of the samples tested withstood the temperature of minus 35 degrees Fahrenheit in the specifications. The average temperature at which the samples failed was minus 18 degrees Fahrenheit.

evaluate whether the STG waterstop was adequate for its intended purpose overlooks the fact that the government had no legal obligation to do so. Accordingly, the government had the right to act as it did by rejecting all STG waterstop used on the project.

As plaintiff correctly points out, however, the government's right to reject nonconforming work or materials is not absolute. In *Southwest Welding & Mfg. Co. v. United States,* the government tested certain welds before installation. After installation, upon testing other welds and finding them defective, the government required removal and replacement of all installed welds. The court found replacement of all welds to be unreasonable under the circumstances, because the government had not adequately proved that all the welding required replacement, since only three percent of the welds were found to be defective. *Southwest Welding & Mfg. Co. v. United States,* 188 Ct.Cl. 925, 955, 413 F.2d 1167, 1185 (1969). Likewise, plaintiff relies on a board of contract appeals decision, in which the board found the government's insistence on total replacement of defective work to be unwarranted. However, unlike the case at bar, in that case the board found the government failed to prove that rejection of the defective work was warranted. *Arnold M. Diamond, Inc.,* ASBCA No. 15063, 73–2 BCA ¶ 10,359.[7] Such is not the case here, where the Board

was persuaded by the testimony of the Corps' expert witnesses to conclude that the Corps had "cogent reasons" for the need to replace the STG waterstop.

Plaintiff's primary witness, an expert in concrete dam design, testified before the Board that, based on his calculations, the STG waterstop was adequate for its intended purpose. In his opinion, the Corps should have adopted Granite's proposal to leave all the STG waterstop in place and splice Vinylex waterstop onto it. Defendant's experts were three Corps engineers who worked on the Aberdeen dam project. They were of the opinion that Granite's remedial proposals did not conform to contract specifications. The Corps engineers explained that, due to differences in the physical characteristics of the defective STG waterstop and the replacement Vinylex waterstop, the two materials could not be satisfactorily spliced together to meet contract specifications. Moreover, the Corps engineers emphasized that the waterstop must meet the contract specifications to ensure the safety and effectiveness of the project. The Board specifically found that Granite's experts "were not persuasive in asserting that the defective waterstop material would work anyway, especially when the failure of the waterstop in the finished project would be significant and extremely expensive to correct, if at all correctable." On the other hand, the Board found the Corps had "cogent rea-

---

*Stiffness in flexure:* The one sample tested passed.
*Accelerated extraction (Ultimate elongation):* The one sample tested was 14% below specifications.
*Accelerated extraction (Tensile strength):* The one sample tested was 21% below specifications.
*Effects of Alkalies:* The one sample tested met the specifications.
Subsequent testing confirmed that the second shipment of STG waterstop also failed to meet contract specifications.

7. In another administrative decision cited by plaintiff, the board of contract appeals upheld the government's rejection of a concrete structure. *Eller Construction, Inc.,* AGBCA 77–171–4, 83–2 BCA ¶ 16,560. The board noted there were cases on both sides of the "removal vs. repair" question, and the outcome usually turned on the facts of each situation. Plaintiff relies on this

decision to support its "economic waste" theory, because the board stated that "[i]f the value of the completed structure is not measurably less than the structure promised, or if the removal of the structure would result in 'unreasonable economic waste,' the Government may be entitled to only the equivalent of nominal damages, or minor repair, and not removal of the entire structure." *Eller Construction* (citing *Valley Asphalt Corp.,* ASBCA No. 15063, 73–2 BCA ¶ 10,359). However, this position generally has not been adopted or followed by the Claims Court or its predecessor the Court of Claims. As discussed above, the general rule followed in this court is reflected in another statement in *Eller Construction:* "There is no general license to install whatever, in the builder's judgment, may be regarded as 'just as good.'" *Eller Construction* (quoting Judge Cardozo in *Jacob and Youngs, Inc. v. Kent,* 129 N.E. 889, 230 N.Y. 239 (1921)).

sons" for requiring replacement of the STG waterstop. To the extent that plaintiff challenges the Board's finding that the Corps had "cogent reasons" for rejecting plaintiff's remedial proposals, the simple answer is that the government is entitled to get exactly what it contracted for, that is, waterstop that complies with the specifications. *See Farwell, supra,* 137 Ct.Cl. at 836, 148 F.Supp. at 949. Plaintiff admits that the STG waterstop that it was required to remove from the concrete did not meet contract specifications.

Plaintiff complains that the Board failed to weigh all the evidence and instead "simply rel[ied] on the technical expertise of the Government." Plaintiff fails to recognize that one of the Board's functions in "battles between experts" is to "choose between expert opinions and theories." Under the Wunderlich Act, the "court must accept the Board's evaluations of conflicting conclusions of expert witnesses, unless the testimony is inherently improbable or discredited by uncontrovertible evidence." *Maitland Bros. Co. v. United States,* 20 Cl.Ct. 53, 64 (1990); *see also Tecon Corp, supra,* 188 Ct.Cl. at 451, 411 F.2d at 1280; *Utley–James, supra,* 14 Cl.Ct. at 808 n. 7. The Board is in a better position than the court to assess the credibility and the demeanor of witnesses, and the court should defer to the Board in this regard when it is reasonable to do so. *Tecon Corp., supra,* 188 Ct.Cl. at 451, 411 F.2d at 1279; *Exxon Corp. v. United States,* 19 Cl.Ct. 755, 761 (1990). The court finds nothing unreasonable about the Board's evaluation of the expert testimony in this matter.[8]

Plaintiff cannot prevail merely because there is some evidence in the record favorable to its position. "Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive." *Sternberger v. United States,* 185 Ct.Cl. 528, 535–36, 401 F.2d 1012, 1016–17 (1968); *see also Arundel Corp. v. United States,* 207 Ct.Cl. 84, 98–99, 515 F.2d 1116, 1124 (1975); *Utley–James, supra,* 14 Cl.Ct. at 814. Because plaintiff has failed to show that the Board's findings are arbitrary and capricious, or that they are not supported by substantial evidence, the court will not disturb them, even if the administrative record may support different findings.[9] *Universal Restoration, Inc. v. United States,* 798 F.2d 1400, 1403 (Fed.Cir.1986); *Wickham Contracting Co. v. United States,* 212 Ct.Cl. 318, 322–23, 546 F.2d 395, 397 (1976). Moreover, in challenging the Board's decision, it is plaintiff's burden to show not only that the Board erred, but also to persuade this court that had such an error not occurred, the result might have been different. *See SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 892 (Fed.Cir.1988). Plaintiff has not carried its burden in this regard.

## CONCLUSION

The court's review of the administrative record shows that the Board's decision is supported by substantial evidence, and otherwise comports with Wunderlich Act standards. Accordingly, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted. The Clerk of the court is directed to enter judgment dismissing plaintiff's complaint. No costs.

---

8. The fact that some personnel changes occurred on the Board between the administrative hearing and the time the Board issued its decision in this matter does not detract from the Board's ability to evaluate evidence before it, nor does it impact a party's due process rights. There is no rule that a board decision be rendered by the same personnel who presided at the hearing. *Peterson–Sharpe Eng'g Corp. v. United States,* 6 Cl.Ct. 288, 293 (1984); *see also Tri–Cor, Inc. v. United States,* 198 Ct.Cl. 187, 194–95, 458 F.2d 112, 116–17 (1972); *Sternber-*

*ger v. United States,* 185 Ct.Cl. 528, 537, 401 F.2d 1012, 1017 (1968). Neither the pleadings nor the briefs allege improprieties in this regard.

9. "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564–65, 108 S.Ct. 2541, 2549–50, 101 L.Ed.2d 490 (1988); *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).